IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 20-00240-01-CR-W-BP |
| ) | |
| VICTOR STOKES, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Victor Stokes's Motion to Suppress Evidence (Doc. #18). For the reasons set forth below, it is recommended that this motion be denied.

I. BACKGROUND

On August 31, 2020, a Criminal Complaint was filed against defendant Victor Stokes. On September 9, 2020, the Grand Jury returned a one-count Indictment against defendant Stokes. The Indictment charges that on August 30, 2020, defendant Stokes, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed ammunition, to wit: three shells of Estate Cartridge ammunition and three shells of Federal ammunition, and the ammunition was in or affecting commerce.

An evidentiary hearing on the motion to suppress was held on April 21, 2021. Defendant Stokes was represented by Assistant Federal Public Defender Robert G. Kuchar. The Government was represented by Assistant United States Attorneys Nicholas Heberle and Kathleen D. Mahoney. The Government called Officer Ian Storey of the Independence, Missouri Police Department as a witness. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. At 2:49 a.m. on August 30, 2020, Officer Ian Storey was dispatched to 10430 East Truman Road for a call of a suspicious person on private property. (Tr. at 3-4.) The caller was the property owner who stated that a person had jumped a guardrail and was standing next to the caller's car. (Tr. at 9, 17.) The description of the suspicious person was a black male with a white t-shirt and black or blue shorts. (Tr. at 3-4.) The property located at 10430 East Truman Road is a salvage lot for vehicles. (Tr. at 4.) A similar salvage lot is located right next to this lot. (Tr. at 4.) Officer Storey testified that at that time, he was being called to these salvage lots a couple times a week. (Tr. at 4.) Officer Storey testified that he made a couple arrests per week for thefts from the vehicles on the lots and for trespassing. (Tr. at 4.) The calls for service at these salvage lots usually came in between 1:00 in the morning to the end of Officer Storey's shift at 6:00 or 7:00. (Tr. at 4.) Officer Storey testified that the majority of people he deals with on those lots at those hours are stealing things. (Tr. at 26.)

2. Officer Storey arrived at 10430 East Truman Road about ten minutes after being dispatched. (Tr. at 5.) Officer Storey observed an individual (later identified as Victor Stokes) walking around on the lot. (Tr. at 5, 19.) Stokes was wearing a white t-shirt and shorts and had a blue lanyard hanging from his waistband. (Tr. at 5, 27.) While Stokes was trespassing, Officer Storey did not observe Stokes committing any other criminal activity. (Tr. at 19.) Stokes was not a black male, as described by the caller. (Tr. at 18.) Officer Storey testified that he did not observe anyone else on the lot or in the surrounding area. (Tr. at 5.) Officer Storey got out of his patrol car and began speaking with Stokes while he was on the lot. (Tr. at 6-7.) Stokes originally told Officer Storey that a friend had told Stokes that Stokes's stolen vehicle was on the lot and that Stokes was waiting there until morning to contact the business. (Tr. at 7.) Officer Storey testified that when he asked Stokes if he had reported the vehicle stolen, Stokes said that he had not reported it stolen. (Tr. at 7.) Officer Storey testified that he was "not seeing the vehicle that [Stokes] was pointing out initially." (Tr. at 8.)

3. Officer Storey testified that defendant Stokes sat down on a curb right after Storey contacted him. (Tr. at 8, 22.) Officer Storey directed Stokes to stand up so that he could be frisked for weapons. (Tr. at 8-9, 22.) Officer Storey decided to frisk Stokes for weapons for Storey's safety as he continued his investigation of a possible theft and a trespass on the property. (Tr. at 8-9.) Officer Storey testified that the factors that led him to want to frisk Stokes were that Storey believed that Stokes was being deceitful, that Stokes had a bunch of things in his pockets, and

2

because of Storey's experience with other individuals at the lot in the early morning hours. (Tr. at 9.) Stokes initially refused to stand up, saying that he had not done anything wrong. (Tr. at 10.) Officer Storey testified that he again told Stokes to stand, which Stokes finally did, but in doing so, Stokes began backing away and looking around which is consistent with people who are about to run. (Tr. at 10.)

4. Officer Storey testified that because it looked like defendant Stokes was going to run, Storey attempted to grab Stokes. (Tr. at 10.) Stokes then reached into his waistband and turned running toward Truman Road. (Tr. at 10.) Officer Storey pulled his service pistol believing that Stokes was reaching for a gun and started giving commands. (Tr. at 10.) Officer Storey testified that he chased Stokes to Truman Road where Storey drew his taser and tased Stokes. (Tr. at 10.) After Stokes fell to the ground, Officer Storey placed him in handcuffs. (Tr. at 12.) Officer Storey testified that Stokes was under arrest for interfering with police. (Tr. at 12.) Officer Storey did not ticket Stokes for trespassing. (Tr. at 26.)

5. Officer Storey searched defendant Stokes incident to his arrest. (Tr. at 12.) Officer Storey located a sawed-off shotgun that was on a lanyard down inside Stokes's pants and several shotgun shells. (Tr. at 12.) After the arrest and search incident to arrest, a check conducted for outstanding warrants and criminal convictions revealed that defendant Stokes had a probation violation and that he was a convicted felon. (Tr. at 12-13.)

## III. DISCUSSION

Defendant Stokes seeks to suppress all evidence, and the testimony related to such evidence, seized from his person on August 30, 2020. Defendant Stokes's motion to suppress is based on the following argument:

> The search and seizure of Mr. Stokes violated his rights under the Fourth Amendment to the United States Constitution, because the police detained Mr. Stokes and searched his person and his belonging without a warrant, probable cause, or valid consent.

(Motion to Suppress Evidence at 1; Doc. #18.) The motion further states that any statements made by defendant Stokes and any other evidence must be suppressed as fruit of the poisonous tree. (*Id.*)

The Supreme Court has described three categories of police-citizen encounters. *See*

*Florida v. Royer*, 460 U.S. 491 (1983). *See also United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988). "The first, and least intrusive, police contact occurs when law enforcement officers merely approach an individual on the street and ask if he is willing to answer some questions. Because this encounter in a public place is consensual, it does not constitute a seizure within the meaning of the fourth amendment." *Hernandez*, 854 F.2d at 297 (citing *Royer*, 460 U.S. at 497). The second is a brief, minimally intrusive seizure or investigative stop which must be supported by a reasonable suspicion of criminal activity. *See Royer*, 460 U.S. at 498-99; *Hernandez*, 854 F.2d at 297. The third is a full-scale seizure arrest which must be supported by probable cause to arrest. *See Royer*, 460 U.S. at 499; *Hernandez*, 854 F.2d at 297.

In order to determine whether a particular encounter is consensual or constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 439 (1991); *United States v. Robinson*, 984 F.2d 911, 913 (8th Cir. 1993). Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual should a court conclude that a seizure has occurred. *See Bostick*, 501 U.S. at 434; *Robinson*, 984 F.2d at 913-14.

In the present case, defendant Stokes contends that "[i]f there was ever a consensual encounter between Mr. Stokes and the police, it ended when Officer Storey ordered him to stand up so that he could frisk Mr. Stokes. This was a command that turned the encounter into a seizure . . ." (Motion to Suppress Evidence at 4; Doc. #18.) In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the totality of the

4

circumstances to see whether the detaining officer had a particularized and objective basis for suspecting criminal activity. *See United States v. Montgomery*, 828 F.3d 741, 743-44 (8th Cir. 2016).

At the time that defendant Stokes was directed to stand up, Officer Storey was confronted with the following circumstances. Officer Storey had been dispatched to a salvage lot at 2:49 in the morning for a call of a suspicious person on private property. (Fact No. 1.) The caller was the property owner. (*Id.*) Officer Storey was familiar with the area as he was dispatched to the salvage lots in this area a couple times each week. (*Id.*) Officer Storey testified that these calls resulted in a couple arrests per week for thefts from the vehicles on the lots and for trespassing. (*Id.*) The calls for service at these salvage lots usually came in between 1:00 a.m. and 6:00 or 7:00 a.m. (*Id.*) Officer Storey testified that the majority of people he deals with on these lots at those hours are stealing things. (*Id.*) Officer Storey arrived at the salvage lot at approximately 3:00 a.m. and observed an individual (later identified as Victor Stokes) walking around on the lot. (Fact No. 2.) While Stokes did not completely match the description of the suspicious person provided in the call for service, Stokes was trespassing on private property. (*Id.*) Officer Storey did not observe anyone else on the lot or in the surrounding area. (*Id.*) Stokes told Officer Storey that he was waiting for the lot to open because a friend had told him that his stolen vehicle was on the lot. (*Id.*) Stokes had not reported a vehicle stolen and Officer Storey did not see the vehicle that Stokes claimed had been stolen from him. (*Id.*) Officer Storey believed that Stokes was being deceitful. (Fact No. 3.) The Court finds that Officer Storey had a reasonable, articulable suspicion of criminal activity and, thus, was justified in conducting an investigative stop of defendant Stokes.

5

Case 4:20-cr-00240-BP   Document 34   Filed 06/08/21   Page 5 of 7

With respect to Officer Storey's authority to frisk defendant Stokes, the Court notes that "a police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987) (citing *United States v. Jones*, 759 F.2d 633, 636-37 (8th Cir.), *cert. denied*, 474 U.S. 837 (1985)). A police officer may conduct a pat-down search of the suspect during an investigative stop if the officer has reason to believe that such person might be armed and dangerous. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). To determine whether an officer had reasonable suspicion to frisk an individual, courts must examine the totality of the circumstances, including inferences and deductions based on the officer's own experiences and training. *See United States v. Davison*, No. 13-00433-01-CR-W-BP, 2014 WL 2957055, *2 (W.D. Mo. July 1, 2014), *aff'd*, 808 F.3d 325 (8th Cir. 2015).

Officer Storey testified that because he believed that defendant Stokes was being deceitful, because it was apparent that Stokes had something in his pockets, and given Storey's experience with other individuals at the lot in the early morning hours, Storey directed Stokes to stand up so that he could be frisked for weapons. (Fact No. 3.) No other officers were on the scene. Officer Storey was concerned for his safety as he continued his investigation. (*Id.*) The Court finds that Officer Storey had a reasonable concern for officer safety which would have justified a frisk for weapons. However, before Officer Storey could perform a frisk, Stokes backed away, reached into his waistband as if reaching for a gun, and ran. (Fact Nos. 3 and 4.) Officer Storey chased Stokes and tased him. (Fact No. 4.) After Stokes fell to the ground, Officer Storey placed him in handcuffs. (*Id.*) The Court finds that the actions taken by

6

Officer Storey were necessary to protect his personal safety and to maintain the status quo while he continued his investigation. Defendant Stokes was arrested for interfering with police and was searched incident to his arrest. (Fact Nos. 4 and 5.) No constitutional violation took place.

Defendant Stokes also makes a fruit of the poisonous tree argument. (Motion to Suppress Evidence at 5; Doc. #18.) Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical and verbal evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). The Court finds that the actions of Officer Storey were lawful. Therefore, the defendant's fruit of the poisonous tree argument must fail.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Stokes's Motion to Suppress Evidence (Doc. #18).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge